SIXTH DIVISION

June 24, 2005

No. 1-03-2551

THE PEOPLE OF THE STATE OF ILLINOIS,    )   Appeal from the

     )   Circuit Court of

Plaintiff-Appellee,     )   Cook County.

     )

     )   No. 01 CR 28093

     )

COREY BAUGH,         )   Honorable

          )   Michael P. Toomin, 

Defendant-Appellant.     )   Judge Presiding.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

A jury found defendant Corey Baugh
 
guilty of first degree murder, four counts of home invasion, and attempted armed robbery.  He was
 sentenced to consecutive 35- and 15-year prison terms for murder and home invasion, and a 10-year term for attempted armed robbery, to run concurrently to the home invasion term.  Defendant contends on appeal that:  (1) his home invasion conviction must be vacated because (a) he cannot be accountable for home invasion based on an entry into his own home, (b) home invasion was a lesser-included offense of felony murder, and (c) his conviction of four counts of home invasion may not rest upon a single entry into the home; (2) the trial court erroneously found him fit to stand trial despite expert opinions regarding his narcolepsy; (3) the State's evidence failed to prove his guilt; and (4) he was denied a fair trial by the State's cross-examination of defendant and closing arguments.  We agree that defendant's separate conviction of home invasion must be vacated because it was the predicate felony of felony murder.  We remand the cause for resentencing on the murder and attempted armed robbery counts but otherwise affirm the judgment of the trial court.

BACKGROUND

On October 24, 2001, two unidentified gunmen entered the home at 233 North Lavergne Avenue in Chicago, attempted to rob the occupants, and shot and killed Kenneth Jones, defendant's brother.  Thereafter, defendant was arrested and charged with 12 counts of first degree murder, four counts of home invasion, and one count of attempted armed robbery.

Fitness Hearing

After defendant's case was set for trial, the defense raised the issue of defendant's fitness to stand trial based on his self-reported condition of narcolepsy.  Specifically, in July 2002, defense counsel informed the court that defendant wanted a continuance, and defendant himself addressed the court and explained counsel did not interview two important witnesses in his case.  Counsel explained why he and defendant disagreed regarding the importance of the two witnesses.
  Then, counsel added that he also requested a continuance due to defendant's narcolepsy, explaining that "[e]very time I talk to him he seems to nod his eyes, put his head forward.  Sometimes it's hard for me to communicate with him."  When the court remarked that defendant seemed perfectly lucid and able to communicate in front of the court, counsel responded that the narcolepsy manifested itself at different times and did not happen all the time.  When counsel informed the court that defendant was discharged from the Navy as a result of narcolepsy, defendant corrected counsel, stating that he was discharged from the Army.
  The trial court ordered a fitness evaluation of defendant.

Three clinical interviews were performed on defendant.  In her August 2002 report, psychiatrist Dawna Gutzmann opined that defendant was currently unfit to stand trial.  She stated that defendant understood the charges against him and the nature of the courtroom proceedings, but suffered from an untreated sleep disorder that caused him to suddenly and unpredictably fall into a deep sleep several times a day.  Dr. Gutzmann opined that defendant's disorder impaired him such that he was unable to assist his counsel in his defense.  Dr. Gutzmann stated that defendant was not subject to involuntary admission but could be restored to fitness if he received appropriate treatment.
  In his October 2002 report, psychiatrist Fidel Echevarria essentially concurred with Dr. Gutzmann's earlier opinion, noted his concern that defendant was not currently receiving medication, and opined that the untreated illness had the "potential" to impair defendant's ability to assist his counsel.

In her February 2003 report, Dr. Gutzmann issued another opinion that was consistent with her earlier opinion.  Dr. Gutzmann noted that defendant complained of feeling depressed and reported that he fell asleep suddenly three or more times each day and experienced occasional cataplexy (brief episodes of sudden bilateral loss of muscle tone, most often associated with intense emotion) 
and sleep paralysis (a situation where an individual awakens from sleep and is alert but unable to move his body).  Dr. Gutzmann noted that defendant was appropriately groomed and cooperative and maintained appropriate eye contact throughout the interview.  Moreover, defendant's speech, motor abilities and mood were normal.  He denied any paranoid ideation and hallucinations.  His thought processes were coherent and goal directed, and his memory, concentration, reasoning, judgment, insight and impulse control were intact. 

At the April 2003 fitness hearing, Dr. Gutzmann testified consistently with her written reports.  She testified that defendant reported he could recall and describe the circumstances surrounding the charges against him.  Dr. Gutzmann also testified that defendant said he, at times, would fall asleep while standing and lose all muscle tone and fall.  Defendant, however, never identified any obstacles--including the narcolepsy–that would impede his ability to assist his attorney in his defense.  Defendant told Dr. Gutzmann he would inform his attorney if he became confused about the courtroom proceedings.  Dr. Gutzmann
 added that, during her August 30-minute and February 10-minute interviews with defendant, she never observed any symptoms of cataplexy and defendant did not fall asleep in her presence or appear to nod off.  Only defendant's lawyers reported witnessing defendant fall asleep involuntarily.  Dr. Gutzmann explained that emotional distress would not make defendant more likely to fall asleep; narcolepsy involved involuntary episodes of sleep and did not appear to be triggered by anything.  Moreover, defendant's 1993 hospital medical records indicated that he was not compliant with taking his medication.   

Dr. Gutzmann explained that her opinion in her reports that defendant suffered from narcolepsy was based upon his self-reporting, but her opinion at trial was also based upon her review of a 1993 hospital sleep study that confirmed the diagnosis of narcolepsy.
  Further, she testified that prescription medication could restore defendant to fitness within one to three months. 

The trial court accepted the diagnosis of narcolepsy but ruled that there was no credible basis to conclude that narcolepsy impaired defendant to the extent that he was unable to assist counsel in his defense.  Specifically, the trial court noted that defendant was present for numerous pretrial court proceedings and always appeared awake, alert and able to comprehend what was gong on.  The court took judicial notice that defendant sat at the table with his counsel for 40 minutes during the fitness hearing and there was no indication that defendant ever fell asleep or became confused.  Then, at the defense's request, the court signed an order referring defendant to medical services for a medication evaluation, stating: "I don't have a problem with that.  If that makes you feel more comfortable in proceeding to trial that's fine."

Trial

At the trial in June 2003, the State presented evidence that in October 2001 defendant ran a sizeable drug business from the house at 223 North Lavergne.  It was a well-known drug house, and defendant made about $1,000 a day selling cocaine to 100 people at that location.  Defendant stayed at the drug house with his brother Kenneth Jones, his sister Sandra Jones, and his nephew Jeff Jones.  Jeff operated a separate drug business out of the same house in competition with defendant. 

Robert Hinman testified that he bought drugs from defendant at the drug house for at least six months.  On the morning of October 23, 2001, Hinman was at the Erie Street apartment of defendant's mother with defendant and his cousin.  About 3 or 4 p.m., defendant made a telephone call and told someone that Jeff was getting too pumped up over on Lavergne and to send somebody over there to take his money and his drugs.  After someone delivered drugs to the apartment, Hinman drove defendant to the Lavergne drug house to sell his "stuff."  Then, Hinman ran several errands for defendant.  At the drug house, Nathaniel Borden sold drugs for defendant, and Kenneth and Sandra usually worked for Jeff.

The house had no electricity and was illuminated by candles.  During the early morning hours of October 24, defendant was alone in a back bedroom, and Jeff and his girlfriend were upstairs.  Hinman, Kenneth, Borden, and others were sitting in the front of the house, and someone knocked on the door.  Hinman was not paying attention, but suddenly two gunmen entered--one had a mask--and told everyone to get on the floor.  The gunmen asked where Jeff was, and Sandra reluctantly told them.  Then, someone began to beat loudly on the front door, and Kenneth asked the gunmen if he could answer the door.  Kenneth answered the door and ran out of the house, and the gunmen ignored him.  The masked gunman guarded the group on the floor while the other gunman went to get Jeff.  Outside the house, however, Kenneth yelled and threw rocks at Jeff's window to warn him.  Both gunmen ran outside, and Hinman heard four gunshots fired.  The group thought Kenneth escaped but became concerned when he did not return to the house.  Eventually, members of the group went to look for Kenneth and found him dead in the street about half a block away.  Then, Hinman called the police
.  
When the police questioned Hinman, he reported the overheard telephone conversation wherein defendant told someone to take Jeff's money and drugs.

Hinman stated that he was an electrician, lived in the suburbs with his mother and used cocaine when he was "playing" but not when he was working.  He characterized himself as an "on and off" addict and would visit defendant, hang out and buy drugs from defendant and Jeff.  Hinman "probably" smoked crack cocaine at the drug house throughout the day at the time of the incident.  Hinman had five felony convictions and was currently incarcerated after pleading guilty to aggravated battery. 

Terry Harper lived three houses away from the drug house and knew defendant for over four years.  When Harper returned home from work after 11 p.m. on October 23, he saw defendant and Borden sitting on the drug house porch.  Defendant came to Harper's house to use the telephone, and Borden used Harper's washroom.  Defendant made a 30-second phone call, hung up, told Harper that "they are on their way," and left.  Later, Harper went to the drug house, found defendant sleeping in a bedroom, woke him up and asked to have some cocaine on credit.  Once Harper received the drugs, he prepared to leave the house, but Sandra answered a knock at the door.  Someone pushed Borden back into the house, and two gunmen entered, told everyone to get down on the floor, and asked for defendant and Jeff.  Harper testified generally 
consistently with Hinman's account of the invasion and attempted robbery, adding that one of the gunmen threatened Sandra when she failed to bring a candle and search for Jeff upstairs.  When one gunman chased Kenneth out the front door, Harper ran home.  Harper stated that at the time of the incident he was addicted to cocaine and basically used it when he was not working.  Harper asserted that he was no longer an addict and used cocaine about twice a week.

 Sandra Jones testified generally consistently with Hinman and Harper regarding the home invasion and attempted robbery.  However, the defense presented the stipulated testimony that Chicago police detective Bella interviewed the witnesses at the scene and noted that Sandra had not witnessed anything and was asleep at the time of the attempted armed robbery.  

Nathaniel Borden testified generally consistently with Hinman and Harper regarding the home invasion and attempted robbery.
 
 In addition, Borden testified that Hinman and Harper were regular customers and frequent drug users.  Borden explained that when he stepped outside the drug house to go home, a man approached him and said he wanted to buy some drugs.  Then, the man grabbed the drugs from Borden's hand and pulled out a gun.  Another man approached and also pulled out a gun.  The men walked Borden back to the house with guns at his back.  Either Kenneth or Sandra answered the door, and the men pushed their way into the house behind Borden and ordered everyone on the floor.  When Sandra refused to go upstairs and get Jeff, one gunman threatened to shoot her in the head.

Chicago police detective Derrick Johnson was assigned to investigate the murder of Kenneth Jones.  He acknowledged that drug dealers sometimes tried to implicate another drug dealer in a criminal case to get rid of competition.  On October 25, 2001, Detective Johnson brought Jeff Jones, Borden and Hinman to the police station for questioning.  Thereafter, Detective Johnson took defendant into custody about 1 a.m. on October 26.  Defendant indicated that he was tired, so Detective Johnson let him sleep until 7 a.m.  Defendant indicated that he understood the 
Miranda
 warnings, agreed to waive them, and said he did not know anything about the murder.  Defendant was then transported to another location where a lie detector test was administered.  After defendant returned to the station, Detective Johnson again advised him of the 
Miranda
 warnings about 4 p.m., and defendant said he wanted to tell the truth.

Detective Johnson testified that defendant said he called his friend Boone and instructed him to rob Jeff at the drug house because Jeff had become too powerful as a competitor and defendant wanted to bring him down.  After Kenneth's murder, defendant met up with Boone, who said the robbery went bad.  Boone explained that he was across the street during the robbery and the two gunmen shot Kenneth because they thought he had a gun.  Defendant gave the same statement to Assistant State's Attorney (ASA) Andrew Weissberg.  Detective Johnson did not recall defendant ever being alone with ASA Weissberg.

ASA Weissberg testified generally consistently with Detective Johnson regarding defendant's statement.  However, ASA Weissberg stated that Detective Johnson left the room a couple of times during the interview.  Moreover, defendant confirmed that he was never improperly treated by the police and was supplied with food.  Defendant did not fall asleep during any time he was in the presence of Detective Johnson or ASA Weissberg.
 

Defendant testified that he was medically discharged from the Army due to his narcolepsy.  He denied ever calling up Boone to set up Jeff's robbery and asserted that he made a phone call to his sister in Hinman's presence while he was at his mother's apartment.  Moreover, at Harper's house later that evening, he attempted to telephone his mother but thought it was too late and hung up the phone before the call went through.  Defendant made the incriminating statements after being held in custody for 1½ days and abruptly awoken by Detective Johnson.  Defendant claimed that Johnson showed defendant a picture of Boone, indicated that several witnesses identified Boone as the gunman, and told defendant he could go home if he admitted to arranging the robbery.  Defendant did not think that he was being accused of any crime or implicating himself in a murder by saying he told Boone to commit a robbery.

The jury found defendant guilty of first degree murder, four counts of home invasion, and attempted armed robbery.  The court sentenced him to 35 years' imprisonment for murder, 15 years on each home invasion count, and 10 years for attempted armed robbery.  The home invasion sentences ran concurrent to each other and consecutive to the murder sentence.  The attempted armed robbery sentence was ordered to be served concurrently.  Defendant appealed.

ANALYSIS

1.  Home Invasion Conviction

Entry of the Dwelling Place of Another

Defendant contends he cannot be convicted for home invasion based on an entry into his own home.  He argues that the evidence clearly established that he lived at 223 North Lavergne Avenue at the time of the offense and the home invasion statute requires that the offender enter the dwelling place of another.  Defendant also argues that because he could not be convicted of the predicate offense of home invasion, he could not be convicted of felony murder.  
The State counters that defendant's argument is without merit because he was accountable for the home invasion committed by gunmen whom he instructed to rob his drug rival, Jeff.

When construing the meaning of a disputed statute, courts must ascertain and give effect to the intent of the legislature.  
People v. Robinson
, 172 Ill. 2d 452, 457 (1996).  The best indicator of legislative intent is statutory language.  
In re Justin M.B.
, 204 Ill. 2d 120, 123 (2003).  If statutory language is plain, the court cannot read limitations or conditions into the statute.    
In re Justin M.B.
, 204 Ill. 2d at 124.
  Issues of statutory interpretation are reviewed 
de
 
novo
.  
In re Justin M.B.
, 204 Ill. 2d at 124.

Under Illinois' statute, a person who is not a peace officer commits home invasion "when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present" and "[w]hile armed with a firearm uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs."  720 ILCS 5/12-11(a)(3) (West 2000).

Furthermore, a person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."  720 ILCS 5/5-2(c) (West 2000).  To prove intent to promote or facilitate a crime, the State must establish beyond a reasonable doubt that defendant shared the criminal intent of the principal or that there was a common criminal design.  
People v. Perez
, 189 Ill. 2d 254, 266 (2000).  
Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense.  
Perez
, 189 Ill. 2d at 266.  
Accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses.  
Perez
, 189 Ill. 2d at 268.  For purposes of accountability, a criminal offense is complete once the elements of the crime have occurred.  720 ILCS 5/5-1 (West 2000) ("[a] person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct); 
People v. Dennis
, 181 Ill. 2d 87, 96-98 (1998) (utilizing an elements-of-the-offense approach and rejecting the 
res
 
gestae
 concept to define the duration of the commission of a criminal offense for purposes of accountability).

We find defendant was properly held accountable for the murder of Kenneth where the evidence established that defendant telephoned Boone to organize the home invasion and robbery of Jeff, and defendant made a second telephone call to confirm that the robbers were on their way.  Moreover, the elements of the home invasion statute were satisfied where the two gunmen were not police officers, did not have authority to enter the house, knowingly entered the dwelling place of another when they knew other people were present, and while armed with guns used force and the threat of force on the people inside the house.  Notably, the element of the home invasion statute concerning the entry of the "dwelling place of another" was satisfied by the gunmen who confronted Borden outside the house, displayed their guns, and pushed their way into the house behind Borden.  This is not a situation where the person who actually invaded the home had some ownership interest in the dwelling or was a joint tenant or resident of the property.
  Here, the evidence presented at trial confirmed that--in addition to defendant--Kenneth, Sandra and Jeff lived at 223 North Lavergne Avenue and neither of the gunmen lived or had any interest in that home.  Defendant's status as a resident does not alter the fact that a home invasion occurred.   

Defendant's reliance on 
 
People v. Reid
, 179 Ill. 2d 297 (1997), 
to support his argument is misplaced.  The analysis in 
Reid
 addressed the situation where the defendant was prosecuted for home invasion for himself entering the home occupied by his wife and of which he was a lawful tenant despite his violation of a protective order prohibiting him from entering that home.  179 Ill. 2d at 315-16.  Moreover, in reaching the conclusion that the husband did not commit home invasion, the 
Reid
 court noted the clear expression of legislative intent to exclude domestic disputes from the reach of the home invasion statute.
(footnote: 1)  
Reid
, 179 Ill. 2d at 316.  Similarly misplaced is defendant's reliance on 
People v. Taylor
, 318 Ill. App. 3d 464, 471-73 (2000)
, where no home invasion occurred when codefendant Heath lived at the victim's apartment, entered the apartment with authority, and robbed and killed the victim
.  Accordingly, the 
Taylor
 court properly concluded that defendant, who remained outside the apartment and fled when he heard the sound of gunfire, was not accountable for home invasion where the elements of home invasion were never established through codefendant Heath's authorized entry into his own residence.  
Taylor
, 318 Ill. App. 3d at 473.

 Defendant also cites for support 
People v. Andersen
, 237 Ill. App. 3d 367, 369 (1992), where defendants, a husband and wife, were convicted of the criminal sexual assault and aggravated criminal sexual abuse of the wife's 15-year-old sister.  The husband committed the acts in question, and the wife was convicted under a theory of accountability.  
Anderson
, 237 Ill. App. 3d at 377.  The wife, who was only 4 years and 11 months older than her sister, argued that she should not have been convicted of aggravated criminal sexual abuse because the statute creating the offense required the perpetrator to be at least five years older than the victim.  
Anderson
, 237 Ill. App. 3d at 377.  
Relying on 
People v. Trumbley
, 252 Ill. 29 (1911), the appellate court reversed the wife's conviction, finding it improper to convict a person, even through accountability, where the act would not have been a crime had she committed it herself.  
Anderson
, 237 Ill. App. 3d at 378. 

Defendant's reliance on 
Anderson
 is misplaced because 
Anderson
's characterization of 
Trumbley
 was inaccurate.  
Trumbley
 never actually held that one could not be criminally responsible for cooperating in an offense that one was incapable of committing personally.  Rather, the turn-of-the-century 
Trumbley
 case determined that an indictment failed to sufficiently allege all the facts constituting the crime of statutory rape against the accomplice where the indictment did not show the accomplice's relation to the crime and the age and gender of the accomplice were unclear.  
Trumbley
, 
252 Ill. at 33.  The court reasoned that the law did not punish underage girls because the purpose of a statute prohibiting sex between males aged 17 or older and girls under 16 years of age was to protect girls against themselves, even if their acts were the result of a "vicious and depraved nature."  
Trumbley
, 252 Ill. at 34.  The court stated that because the law did not punish the underage but willing female, it would not be harmonious to punish an underage girl of aiding or abetting any such sexual liaison.  
Trumbley
, 252 Ill. at 34.

Notably, 
Trumbley
 acknowledged the rule that "one who is incapable of committing the specific offense may, if of sufficient natural discretion, be convicted of being present and aiding and abetting another in the commission of such offense."  
Trumbley
, 
252 Ill. at 35.  Subsequently, in 
People v. Damen
, 28 Ill. 2d 464, 466 (1963), our supreme court ruled that a husband could be convicted of aiding, abetting, and assisting in the rape of his wife, even though he could not, under the law valid at the time, be guilty if he committed the act himself.  Because 
Anderson
 mischaracterized 
Trumbley
 and ignored 
Damen
, we will not follow and apply 
Anderson
 in the instant case.   

Here, all the elements of home invasion were proven beyond a reasonable doubt, including the gunmen's unauthorized entry into the "dwelling place of another."  Furthermore, the evidence established that defendant was accountable for the crimes committed by the gunmen because he instructed the gunmen to rob his rival, scheduled the event and confirmed that the intended robbery victim was at the location before the gunmen's arrival.    

Lesser-Included Offense

Next, defendant contends his conviction for home invasion must be vacated because home invasion was a lesser-included offense of his felony murder conviction.  Defendant argues that alleging the predicate felony of home invasion in the felony murder charge had the effect, upon conviction, of making the predicate felony a necessarily included offense that cannot support a separate conviction and sentence.  The State responds that attempted armed robbery also served as the predicate offense for the felony murder conviction, and defendant has waived any lesser-included-offense argument regarding attempted armed robbery by failing to make such an argument in his brief.  However, we will address the lesser-included-offense issue because the conviction and sentence for home invasion affect defendant's substantial rights
.  
People v. Smith
, 183 Ill. 2d 425, 430 (1998).

According to the record, count III of the indictment charged defendant with felony murder based on attempted armed robbery, and count IV charged felony murder based on home invasion.  The jury returned a general verdict finding defendant guilty of first degree murder, which is presumed to be based on any good count in the indictment to which the proof was applicable.  
People v. Cardona
, 158 Ill. 2d 403, 411 (1994).  Thus, defendant was found guilty of felony murder predicated on home invasion as well as felony murder predicated on attempted armed robbery.  Moreover, the trial court merged the two felony murder counts for purposes of sentencing.

Where only one person has been murdered, there can only be one conviction for murder, and sentence is to be imposed on the most serious offense.  
Cardona
, 158 Ill. 2d at 411.  Here, the felony murder count predicated on the Class X felony of home invasion was a more serious offense than the felony murder predicated on the Class 1 
felony of attempted armed robbery.  The trial court is presumed to know the law and apply it properly (
People v. Koch
, 248 Ill. App. 3d 584, 591 (1993)), so the court properly sentenced defendant for first degree murder predicated on home invasion.  Accordingly, the underlying felony of home invasion was a lesser-included offense and cannot support a separate conviction and sentence.  
Smith
, 183 Ill. 2d at 432; 
People v. Washington
, 272 Ill. App. 3d 913, 919 (1995).  Therefore, we vacate defendant's conviction for home invasion and corresponding 15-year sentence and remand with directions to the trial court to amend the sentencing order accordingly.

We note that the trial court, relying on 
People v. Carney
, 327 Ill. App. 3d 998, 1002 (2002), ordered the now-vacated home invasion sentence to run consecutively to the felony murder sentence based on the death of Kenneth, the victim of the home invasion.  Moreover, the trial court ordered defendant's 10-year attempted armed robbery sentence to run concurrently to the now-vacated 
home invasion sentence.  We do not disturb defendant's convictions for felony murder and attempted armed robbery.  However, given our reversal of the home invasion conviction, and because the considerations of the trial court might be different when imposing sentences for felony murder and attempted armed robbery, we conclude that the best procedure is to vacate defendant's sentences for felony murder and attempted armed robbery, and remand for resentencing on defendant's convictions for both felony murder and attempted armed robbery.  
Cardona
, 158 Ill. 2d at 414; 
People v. Johnson
, 102 Ill. App. 3d 122, 130 (1981). 

Multiple Convictions for One Illegal Entry

Defendant also asserts, the State concedes, and we agree, that defendant cannot be convicted of four counts of home invasion where the evidence presented at trial showed that only one illegal entry occurred.  
People v. Hicks
, 181 Ill. 2d 541, 548-49 (1998).  However, because we vacated defendant's conviction for home invasion as a predicate and, thus, lesser-included offense of felony murder, this issue is moot.

2.  Fitness to Stand Trial

We next address the issue of whether the trial court abused its discretion in finding defendant fit to stand trial.  A defendant is considered unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense.  
People v. Coleman
, 168 Ill. 2d 509, 524 (1995).  Both Drs. Gutzmann and Echevarria reported that defendant understood the nature and purpose of the proceedings against him, and defendant does not contend otherwise.  The only question concerns defendant's ability to assist in his own defense.  Specifically, the issue on appeal focuses on the trial court's rejection of the expert opinions that defendant's potential to suddenly and unexpectedly fall asleep, in and of itself, rendered him unable to assist in his defense and, thus, unable to function within the context of a trial.

By statute, evidence on the following matters is admissible at a fitness hearing:

"(1) The defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

(2) The defendant's ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel;

(3) The defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." 725 ILCS 5/104-16(b) (West 2000).

A defendant's trial court demeanor, while not dispositive of the issue of fitness, is clearly relevant to these statutory factors for determining fitness.  
People v. Mitchell
, 189 Ill. 2d 312, 335 (2000).

Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas.  A person can be fit for trial although his mind may be otherwise unsound.  
Coleman
, 168 Ill. 2d at 524.
  In making the fitness determination, the court should consider whether the defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding and whether the defendant has both a rational and factual understanding of the proceedings.  
People v. Newell
, 196 Ill. App. 3d 373, 377 (1990).  The ultimate issue of fitness is for the trial court, not the experts, to decide.  
Coleman
, 168 Ill. 2d at 525.  The mere fact that a psychiatrist expresses the opinion that the defendant is unfit does not require a similar finding by the trial court; it is the trial court's function to assess the credibility and weight to be given to a psychiatric expert's testimony.  
Coleman
, 168 Ill. 2d at 525.

Where a 
bona
 
fide 
doubt of defendant's fitness has been raised, the State has the burden of proving, by a preponderance of the evidence, that defendant is fit.  
Newell
, 196 Ill. App. 3d at 377.  A trial court's fitness determination will be reversed only upon a showing of an abuse of discretion.  
Newell
, 196 Ill. App. 3d at 377.

The record supports the trial court's decision that defendant was fit to stand trial where defendant assisted in his defense during pretrial proceedings, the factual basis failed to support the expert opinions regarding defendant's unfitness, and the trial court had the opportunity to observe defendant during the fitness hearing.

We note that defense counsel informed the court that sometimes it was hard to communicate with defendant because he would seem to nod his eyes and put his head forward; however, counsel did not report that defendant could not be roused or was confused, nonresponsive or unable to communicate.  Certainly a sleepy client might require counsel to perhaps repeat explanations or questions during interviews, and question the client to ascertain that he was following and comprehending the discussion.  Although this might pose some added difficulty for defense counsel, it does not rise to such a level of difficulty that renders a defendant unable to assist in his defense.  Clearly, defendant was very involved in assisting in his defense.  The record establishes that when defendant disagreed with counsel's decision not to interview two witnesses, defendant himself addressed the court and asked for a continuance.  Specifically, defendant thought the two witnesses were in the same room when Hinman allegedly overheard defendant's telephone call to Boone, so defendant disagreed with counsel's opinion that the two witnesses were unimportant.  Moreover, during that pretrial conference, defendant demonstrated his ability to follow and participate in the proceedings by correcting counsel regarding defendant's particular branch of military service.  The trial judge noted that defendant was present for numerous pretrial court proceedings and always appeared awake, alert and able to comprehend.  In addition, there was no indication that defendant ever fell asleep or became confused during the fitness hearing.  

Furthermore, the factual basis failed to support the ultimate expert opinions that defendant's narcolepsy rendered him unfit to stand trial.  Although Dr. Gutzmann reported that defendant's narcolepsy impaired him such that he was unable to assist in his defense, Dr. Echevarria merely reported that the untreated narcolepsy had the "potential" to impair defendant's ability to assist his counsel.  In addition, Dr. Gutzmann's opinion was at odds with defendant's self-reported ability to assist counsel and Dr. Gutzmann's own observations regarding defendant's cooperative nature, coherent mental abilities, and intact memory and concentration.  Specifically, defendant never identified any obstacles, including his narcolepsy, that impeded his ability to assist his attorney and reported that he would tell his attorney if he became confused about the courtroom proceedings.  Moreover, a
ccording to Dr. Gutzmann, defendant was cooperative and never fell asleep, nodded off or suffered cataplexy during her evaluations.  
His speech, motor abilities and mood were normal.  He did not suffer any paranoid ideation or hallucinations.  His thought processes were coherent and his memory, concentration, reasoning, judgment, insight, and impulse control were intact.

Notably, Dr. Gutzmann never stated with any degree of specificity how defendant's narcolepsy impaired his ability to assist in his defense or affected his ability to make certain decisions.  Dr. Gutzmann never indicated that defendant could not be roused from any sleep episode, and defendant denied suffering any hallucinations.  Dr. Echevarria's report and Dr. Gutzmann's reports and testimony simply did not establish that defendant was not able to assist in his defense, and the trial court properly analyzed and evaluated the factual basis for their expert opinions rather than merely relying on the ultimate opinions.  
People v. Bleitner
, 189 Ill. App. 3d 971, 976 (1989).  There is no indication that the experts observed defendant interact with counsel before forming their opinions and, therefore, had any personal knowledge of defendant's ability to assist in his defense.  In contrast, the trial court observed defendant interact with counsel during pretrial proceedings, particularly where defendant addressed the court and insisted that counsel promptly interview particular witnesses as part of the defense strategy.  The experts' opinions were not persuasive even absent any countervailing expert or lay testimony.  A review of the record indicates the experts were evaluating defendant's untreated sleep disorder rather than his ability to assist in his defense.  Their evaluation was more enlightening as to the diagnosis of defendant's narcolepsy than as to his ability to cooperate in his defense.

D
efendant cites 
People v. Williams
, 87 Ill. App. 3d 860, 864 (1980), and 
People v. Baldwin
, 185 Ill. App. 3d 1079, 1087 (1989),
 to support his argument that the trial court cannot reject an expert's conclusion that a defendant is unfit without other testimony or evidence that the defendant was in fact fit.  However, we find those cases distinguishable.  In 
Williams
, the trial court improperly rejected psychiatric expert testimony that the defendant was unfit due to his memory defects and psychotic symptoms, which impeded his ability to assist in his defense.  
Williams
, 87 Ill. App. 3d at 862-63.  Although both experts explained the basis for their opinions--namely, the defendant's difficulty in remembering things, his tendency toward fantasy and daydreaming, lack of judgment, unrealistic desires, and impaired memory of past events--the trial court nevertheless rejected the expert opinions as imprecise guesses and relied on common sense and his observation of the defendant.  
Williams
, 87 Ill. App. 3d at 862-63. 
 
Moreover, the defendant did not testify at the fitness hearing or trial, and the trial court's observation of defendant consisted of brief exchanges of casual conversation.
  
Williams
, 87 Ill. App. 3d at 864.  Here, in contrast, Drs. Gutzmann and Echevarria never persuasively specified the basis for their opinions, and "the conclusions of experts are only as valid as the bases or reasons for them."  
Williams
, 87 Ill. App. 3d at 864.  As discussed above, Dr. Gutzmann's own observations regarding defendant during her evaluations undermined her ultimate conclusion that he was unable to assist in his defense.  Furthermore, the trial court's exposure to defendant was neither brief nor limited to casual conversations, and defendant testified at the trial.

In 
Baldwin
, the trial court improperly rejected expert testimony that the defendant suffered from acute psychosis due to paranoid schizophrenia and was unfit to stand trial.  
Baldwin
, 
185 Ill. App. 3d at 1085.  The expert explained that the defendant demonstrated delusions of both religiosity and persecution, including the beliefs that people were conspiring and plotting against him and that he was in direct communication with God and would be saved.  
Baldwin
, 185 Ill. App. 3d at 1085.  
The expert opined that the defendant was unfit because he was unable to cooperate with counsel in his defense as a result of his abnormal and paranoid thinking.  
Baldwin
, 185 Ill. App. 3d at 
1085.  The only other countervailing evidence was defendant's testimony at his fitness hearing that he was cooperating with counsel, she was " 'good,' " and although defendant often felt depressed he could nevertheless help his attorney because he considered the case " 'open and shut. ' "  
Baldwin
, 185 Ill. App. 3d at 
1086.  
The instant case, however, does not involve a situation where the trial court rejected persuasive expert opinion merely based upon the defendant's opinion that he could cooperate with counsel in his defense.  See 
People v. McKinstray
, 30 Ill. 2d 611, 616-17 (1964) (an incompetent defendant cannot be accepted as a reliable witness to his own competency).  Rather, the trial court here relied on his observations that defendant was in fact assisting in his defense in the pretrial hearings.  Specifically, the trial court observed defendant in pretrial hearings interact with counsel, address the court, request a continuance, insist that counsel interview particular witnesses, interject to correct counsel's inaccurate statement regarding the facts, and respond cogently to the court's questions.

We find the instant case more analogous to 
Bleitner
, where the trial court properly rejected psychiatric opinions that defendant was unfit.  
Bleitner
, 
189 Ill. App. 3d at 975.  
Specifically, the experts opined that defendant's manic episodes and paranoid personality disorder prevented him from fully cooperating with his attorney due to a lack of candor or the supplying of misleading information.  
Bleitner
, 189 Ill. App. 3d at 975.  Although lay witnesses from the jail testified that the defendant was communicating with and assisting his attorney, the appellate court affirmed the trial court's rejection of the expert testimony where the "psychiatric testimony offered was not persuasive 
even absent the countervailing lay testimony
."  (Emphasis added.)  
Bleitner
, 189 Ill. App. 3d at 977.  Moreover, the trial court's own observations of the defendant during the fitness hearing were consistent with the lay testimony offered regarding the defendant's ability to cooperate.  
Bleitner
, 189 Ill. App. 3d 
at 977.  Here, the State never presented any similar lay or expert testimony regarding defendant's ability to assist in his defense.  Nevertheless, defendant's active participation during the pretrial hearings and his demeanor during the fitness hearing, as observed by the trial judge, provided a sufficient basis for the trial court to reject the unpersuasive expert opinion that defendant's narcolepsy rendered him unable to assist in his defense.

Furthermore, the record belies any claim that defendant was unable to assist in his defense during the trial.  His exchanges with the trial judge were responsive and did not display any confusion during the proceedings, and he assisted in his defense by testifying on his own behalf.  He testified to his whereabouts at the relevant times, denied any involvement in the crime, and asserted that his confession to the police was coerced.  His testimony covered over 70 pages of the report of proceedings and does not disclose any signs of confusion, inability to communicate with counsel, inability to respond to questioning, or sudden episodes of falling asleep.  Moreover, the trial court verified that throughout the trial defendant was taking notes and having conversations with his counsel.

In light of the factors that a trial court considers in determining fitness for trial and the trial court's observations that defendant cooperated in his defense, the trial court did not abuse its discretion by accepting the diagnosis of narcolepsy but rejecting unpersuasive expert opinion that defendant's narcolepsy rendered him unable to assist in his defense.

3.  Sufficiency of the Evidence  

Next, defendant contends he was not proven accountable for the crimes committed by the gunmen beyond a reasonable doubt where 
the State's primary witnesses were drug addicts and their testimony was impeached, contradictory and not credible.
  Specifically, defendant argues that Hinman, a convicted felon and drug addict, was motivated to falsely implicate defendant in order to please Jeff, his new supplier for drugs.  Moreover, Harper was addicted to cocaine and still using cocaine at the time of trial.  Further, Sandra Jones was a drug addict and impeached by a police report indicating she was asleep at the time of the home invasion.

When a defendant challenges the sufficiency of the evidence, we must determine whether the evidence, when viewed in the light most favorable to the prosecution, allows any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.  
People v. Young
, 128 Ill. 2d 1, 49 (1989).
  
This standard of review applies in all criminal cases whether the evidence is direct or circumstantial.  
People v. Tenney
, 205 Ill. 2d 411, 427 (2002).  It is the function of the trier of fact to determine the inferences to be drawn from the evidence, assess the credibility of the witnesses, decide the weight to be given their testimony, and resolve any evidentiary conflicts.  
People v. Tirado
, 254 Ill. App. 3d 497, 513 (
1993).  We will not substitute our judgment for that of the trier of fact on questions involving the weight to be assigned the evidence or the credibility of witnesses.  
People v. Campbell
, 146 Ill. 2d 363, 375 (1992).  Defendant's argument regarding the sufficiency of the evidence is unpersuasive because the weaknesses in the evidence that defendant cites on appeal were all presented to, and rejected by, the jury.

Facts concerning Hinman's, Harper's and Sandra Jones' credibility were put before the jury, who weighed those witnesses
' credibility and the corroborating evidence to find defendant guilty beyond a reasonable doubt.  Specifically, the evidence presented informed the jury that, 
prior to the home invasion, Hinman observed and heard defendant telephone someone to order the robbery of Jeff at the drug house.  Furthermore, shortly before the home invasion, Harper allowed defendant to use Harper's home telephone and observed defendant finish his telephone call and then state that "they are on their way."  In addition, defendant corroborated Hinman's testimony by admitting to Detective Johnson and ASA Weissberg that he telephoned Boone in Hinman's presence and ordered the robbery of Jeff.  Defendant also admitted to meeting Boone shortly after the crime to learn what went wrong. 
 Moreover, defendant admitted that he was concerned about competition from Jeff's rival drug business but never intended for anyone to be killed.

There was no evidence that Borden was a drug addict, and he corroborated Hinman's, Harper's, and Sandra's testimony regarding the home invasion, the gunmen's actions and Kenneth's attempt to flee the house and warn Jeff about the robbery.  Although there was stipulated testimony that a detective at the scene noted in a report that Sandra was asleep during the offense, Harper and Borden corroborated Sandra's account that a gunman threatened to shoot her in the head when she refused an order to go upstairs and get Jeff and then dropped a hot candle.  The discrepancy between the police report and Sandra's account was not surprising where the record indicates that all the witnesses were initially reluctant to contact, let alone cooperate with, the police.  Specifically all the witnesses where either operating or patronizing a notorious drug house and did not contact the police about the home invasion and armed robbery until after they became concerned about Kenneth's long absence, searched for him and found him dead in the street.  

Defendant makes several arguments concerning the credibility of Hinman's testimony.  Defendant contends Hinman repeatedly failed to remember various details regarding the offense, gave dubious or equivocal answers to counsel's questions, and testified inconsistently regarding his drug use and the event on the date in question.  However, our review of Hinman's entire testimony refutes defendant's assertion.  Any confusion or vagueness in Hinman's testimony regarding his drug use or the event resulted from vague or confusing lines of questioning by counsel.  Defendant also argues Hinman's testimony that he was taken to the police station for questioning in a squad car was impeached by Detective Johnson's testimony that Hinman drove his own vehicle to the police station.  Despite this minor inconsistency regarding his mode of transportation 1½ years prior to his trial testimony, the jury deemed Hinman to be credible, and such credibility determinations are the responsibility of the trier of fact.  
People v. Green
, 339 Ill. App. 3d 443, 450 (2003).  In addition, defendant argues that Hinman would lie to incriminate defendant in order to please Jeff as his new drug supplier.  However, Hinman testified that before the home invasion he bought drugs from both defendant and Jeff and after the home invasion Jeff was not Hinman's sole source for obtaining drugs.

Defendant also contends Detective Johnson's testimony was contradictory and questionable regarding the identify of Boone, whom defendant telephoned and told to rob Jeff at the drug house.  According to defendant, Detective Johnson thought Boone was identified as Jones and that Hinman was also known as Boone.  However, our review of Detective Johnson's entire testimony established that any discrepancy or misstatement resulted from the questioner, the witness or the court reporter confusing the similar-sounding names or nicknames of Boone, Hinman (a.k.a. White Boy Bob), and Borden (a.k.a. Boo).  A complete reading of his entire testimony confirms that Detective Johnson did not think Boone was either Jones or Hinman.

Finally, defendant contends that his testimony was credible and he gave a plausible explanation for giving the police the false incriminating statement.  Specifically, defendant testified that the statement was the result of coercion and promises where he was held for over a day and a half, was abruptly awoken by Detective Johnson, was tired, was shown a picture of Boone and told several witnesses already identified Boone as the culprit, and promised that he could go home if he said he arranged for Boone to commit the robbery.  The jury, however, heard the countervailing testimony of Detective Johnson and ASA Weissberg, observed the demeanor of all the witnesses, and rejected defendant's version of the events as not credible.

Hinman, Harper, and Sandra Jones were thoroughly questioned on direct and cross-examination regarding their drug use and/or criminal history.  Furthermore, Borden testified that Hinman and Harper were regular customers and drug users.  In addition, the defense's closing argument stressed to the jury that the State's witnesses were not credible because they were felons and/or drug addicts.  Conversely, the State's closing argument stressed to the jury that defendant's denial of any involvement in the offense and claim that the police coerced him into giving a false confession were not credible.  The jury heard all this information, assessed the witnesses' credibility, weighed the evidence, rejected defendant's testimony and found him guilty beyond a reasonable doubt.  We find no reason to disturb to jury's verdict.

4.  Prosecutorial Misconduct

Next, defendant contends the prosecutor engaged in numerous instances of misconduct during the cross-examination of defendant and closing argument.  Defendant argues that both the individual instances and the cumulative effect of the alleged misconduct deprived him of a fair trial.  We disagree.

Questioning of Defendant During Cross-examination

Defendant contends the prosecution harassed and humiliated him by repeatedly asking him during cross-examination if he "really" expected the jurors to believe his testimony on the stand and asked him to judge the truthfulness of Detective Johnson's testimony.

When reviewing allegations of improper questions on cross-examination, we will not interfere with the trial court's ruling absent a clear abuse of discretion resulting in prejudice to the defendant.  
People v. Piscotti
, 136 Ill. App. 3d 420, 439-440 (1985)
.  Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  
People v. Blue
, 205 Ill. 2d 1, 22 (2001).  While it is permissible to cross-examine a witness in order to explain, modify or discredit what he said on direct examination, cross-examination that is designed to harass, annoy or humiliate a witness should not be tolerated.  
People v. Lyles
, 106 Ill. 2d 373, 402 (1985).

According to the record, defendant contradicted Hinman's and Harper's testimony regarding the substance of the alleged overheard telephone conversations with Boone.  Further, defendant testified that 
Detective Johnson said other people had already identified Boone as the culprit and defendant could go home if he admitted to setting up the home invasion and armed robbery with Boone.  Defendant also testified he did not understand that he was implicating himself by such an admission.  During cross-examination, the prosecutor properly questioned defendant regarding what he believed his status in this case was when he was held at the police station, why he confessed,
 
why he thought the police would let him go home if he admitted to setting up the crimes with Boone, and whether defendant really believed what he alleged Detective Johnson promised him, 
i.e.
, freedom in exchange for a confession.  When the prosecutor asked defendant if he expected the jurors to believe Detective Johnson told him he could go home if he confessed, the trial court sustained the defense's objection.

Defendant was not denied a fair trial by the legitimate, albeit vigorous, cross-examination, which sought to clarify and discredit defendant's assertions that Detective Johnson coerced defendant's confession through trickery and promises.  Great latitude is allowed in cross-examination in order to achieve the well-recognized purpose of showing those matters which affect the credibility of the witness.  See 
People v. Phillips
, 127 Ill. 2d 499, 531-32 (1989).
  The adversarial process of cross-examination may at times offend the sensibilities of the uninitiated, and the savvy attorney might well tend to avoid being classified as a bully by the jury he is trying to influence if confronted by an inexperienced or shy witness.  See 
Phillips
, 127 Ill. 2d at 531.  However, a murder defendant would expect vigorous questioning by the prosecution regarding the accuracy and credibility of assertions that the police coerced the defendant's confession.  Such questioning is not automatically elevated to harassing or humiliating conduct merely because it may be perceived as difficult when it seeks to clarify a point that the proponent would rather not have elucidated.  See 
Phillips
, 127 Ill. 2d at 531.   

Later during cross-examination, defendant admitted telling Detective Johnson he met with Boone but denied saying the purpose of the meeting was to set up Jeff.  The prosecutor then asked, "And Detective Johnson is making that up, right. Because you were ready to go home, right?"  While it is improper for the State to ask a defendant if other witnesses have given false testimony, such questioning is not grounds for a new trial where, as here, the questioning is not extensive and is primarily directed to the defendant's denials of statements he has made in police custody.  See 
People v. Kokoraleis
, 132 Ill. 2d 235, 265 (1989); 
People v. Morris
, 229 Ill. App. 3d 144, 168 (1992); 
Piscotti
, 136 Ill. App. 3d at 440.
  Although the State should not have cross-examined defendant in this manner, we cannot say, in light of the evidence presented against him, that the error was of such magnitude that he should be granted a new trial.

Defendant cites 
People v. Young
, 347 Ill. App. 3d 909, 925-26 (2004), to support his argument that asking a criminal defendant to comment on the veracity of other witnesses who have testified against him has consistently and repeatedly been condemned by this court because it intrudes on the jury's credibility-determination function and demeans and ridicules the defendant.  We agree with this proposition, but find 
Young
 distinguishable from the facts in the instant case.  In 
Young
, the prosecutor asked the defendant to comment several times on the veracity of the medical examiner and two friends who testified against defendant.  347 Ill. App. 3d at 925.  Here, in contrast, the prosecutor asked defendant the improper question only once.  Moreover, the question was directed at defendant's specific testimony, which denied making an admission to Detective Johnson; the prosecutor did not ask defendant's opinion of the general veracity of Detective Johnson's testimony.

Closing Arguments

Furthermore, defendant contends that the State made improper comments in closing argument, which shifted the burden of proof, minimized the State's burden of proof, misstated 
the relevant law, and disparaged the defense theory of the case.  Defendant argues the prejudicial comments, individually or cumulatively, 
denied him a fair trial.

Comments made in closing argument must be considered in context by examining the entire closing arguments of both the State and the defendant.  
People v. Kliner
, 185 Ill. 2d 81, 154 (1998)
. It is well established that the State is given wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence.  
Kliner
, 185 Ill. 2d at 151
. 
 
Further, the State may respond to comments by defense counsel that clearly invite a response.  
Kliner
, 185 Ill. 2d at 154
.  The trial court has discretion to determine the proper character, scope and prejudicial effect of closing arguments.  
Kliner
, 185 Ill. 2d at 151.  Improper remarks warrant reversal only where they result in substantial prejudice to the defendant, considering the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.  
Kliner
, 185 Ill. 2d at 152.  We find that the complained-of comments were not error, did not result in substantial prejudice to defendant and were not a material factor in his conviction.

First, defendant contends the prosecutor improperly shifted the burden of proof by arguing defendant should have produced telephone records to prove his innocense.  According to the record, defense counsel argued at length that he could not believe why the State failed to introduce the records of Hinman's mobile phone, the home telephone of defendant's mother
, or Harper's home telephone.  Counsel argued that it was easy for the government to get those records by issuing a subpoena but the State chose not to give the jurors the chance to consider such tangible evidence.  In response, the prosecutor stated the defense also has the power to subpoena phone records and present them to the jury if the defense chose to do so.

The defense argument implied that the State had access to certain evidence but failed to use it at trial because it hurt the State's case.  Contrary to defendant's argument on appeal, the State did not improperly argue that defendant must produce evidence to establish reasonable doubt, but merely responded that defendant also had subpoena power after the defense invited such comments.  
People v. Albanese
, 104 Ill. 2d 504, 522 (1984).  We find there was no error.

Next, defendant contends the prosecutor minimized the State's burden of proof by arguing that the "prison is filled with people where we've met that burden.  And counsel makes it sound like it's a once in a lifetime event that only when the moon is aligned that cases are proven beyond a reasonable doubt."  This claim was waived because defendant did not object to the comments at trial and in a posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 185-86 (1988).  Waiver notwithstanding, defendant was not denied a fair trial where courts have ruled that similar comments, 
i.e.
, that the standard of reasonable doubt was not an unreasonable burden and was met every day in courts, were found to be within the proper bounds of argument.  
People v. Bryant
, 94 Ill. 2d 514, 523-24 (1983); 
People v. Woods
, 173 Ill. App. 3d 244, 250 (1988).  

Next, defendant contends the prosecutor misstated the law in arguing that "[s]omeone took the stand and lied.  Is it Detective Johnson?  Is it White Boy Bob?  Is it Terry Harper?  Or is it the defendant?"  According to defendant, the prosecutor impermissibly suggested that in order to believe defendant's testimony, the jury had to believe that all the State's witnesses were lying.  This claim was waived because defendant did not object to the comments at trial and in a posttrial motion.  
Enoch
, 122 Ill. 2d at 185-86.  
Waiver notwithstanding, the record establishes that the State did not exceed the proper bounds of argument.   It is a misstatement of law and serious error to argue that in order to acquit the defendant the jury must believe that the State's witnesses were lying.  
People v. Coleman
, 158 Ill. 2d 319, 346 (1994);
 
People v. Miller
, 302 Ill. App. 3d 487, 497 (1998)
.  Furthermore, it is usually a misstatement of evidence and a less serious error to argue that in order to believe the defendant's version of the incident the jury must believe that the State's witnesses were lying.  
Coleman
, 158 Ill. 2d at 346;
 
Miller
, 302 Ill. App. 3d at 497
.  However, that is not what the State said in closing argument.  Here, the State argued that, given the contradictory testimony, someone lied on the stand.  See 
People v. Pecoraro
, 144 Ill. 2d 1, 16 (1991) (comment that the jury's disbelief in certain witnesses will lead to a not-guilty verdict held to be proper where the prosecution's version of the incident varies substantially from the version given by the defense).  The State did not exceed the proper bounds of closing argument because the State never informed the jury that it had to believe the State's witnesses were lying in order to either believe or acquit defendant.

Next, defendant contends the State disparaged the defense theory of the case by repeatedly arguing to the jury that the defense theory was a joke.  Specifically, in rebuttal, the prosecutor stated, "What a joke.  What a joke.  What are they asking you to believe?  What is their theory of the case?  What are they asking you to believe?"  Later, the prosecutor again characterized defendant's testimony and defense theory as "a joke."

This claim was waived because defendant did not object to the comments at trial and in a posttrial motion.  
Enoch
, 122 Ill. 2d at 185-86.  
Waiver notwithstanding, the State's argument was not error.  The prosecutor may comment on the credibility of defense witnesses, denounce defendant's activities, urge the administration of justice, and highlight inconsistencies in the defendant's arguments.  
People v. Tolliver
, 347 Ill. App. 3d 203, 227 (2004).  The prosecutor never personally attacked defense counsel in any manner and never called defense counsel a liar or questioned his integrity.  The prosecutor's comments properly focused on defendant's theory of the case and not on defense counsel.

Even if the complained-of remarks could be said to have exceeded the bounds of proper commentary, the remarks were not numerous and, whether viewed independently or cumulatively, do not constitute reversible error by engendering substantial prejudice against defendant and casting doubt on the reliability of the judicial process.  See 
People v. Blue
, 189 Ill. 2d 99, 138 (2000).  We perceive no misconduct on the part of the prosecutor and do not find that the complained-of comments resulted in substantial prejudice to defendant due to the nature of the evidence against him and where the trial court 
promptly sustained objections and instructed the jury that arguments were not part of the evidence and should not be considered as such.

CONCLUSION

For the reasons stated, we affirm defendant's convictions for felony murder and attempted armed robbery, his convictions for home invasion are vacated, the sentences imposed for felony murder and attempted armed robbery are vacated, and the cause is remanded to the circuit court for resentencing on the convictions for felony murder and attempted armed robbery.

Affirmed in part and vacated in part; cause remanded.

McNULTY and O'MARA FROSSARD, JJ., concur.

FOOTNOTES
1:  Following the 
Reid
 decision, the legislature amended the home invasion statute by adding section (6)(d), which defined "dwelling place of another" to include a place where the defendant maintains a tenancy interest but from which he had been barred by a divorce decree, judgment of dissolution of marriage, order of protection, or other court order.  Pub. Act 90-787, eff. August 14, 1998 (amending 720 ILCS 5/12-11).  Thus, the amendment illustrates that it is possible for a defendant to be convicted of a home invasion of his own home.