No. 2--06--0452          Filed: 8-15-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2916 |
| CHARLES I. SCHORECK, JR., | ) ) ) | Honorable Joseph G. McGraw, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Charles I. Schoreck, Jr., appeals his conviction of aggravated battery (720 ILCS 5/12--4(b)(1) (West 2004)), arguing that: (1) the trial court abused its discretion in concluding that the State, at a January 2006 fitness hearing, proved him fit to stand trial; and (2) the trial court did not engage defendant in a colloquy adequate to insure that his waiver of his right to present an insanity defense was knowing, intelligent, and voluntary. We hold that the trial court's finding of fitness at the January 2006 hearing was against the manifest weight of the evidence. Alternatively, we hold that the trial court erred in not sua sponte holding another fitness hearing when further doubts of defendant's fitness arose at trial and sentencing. Accordingly, we reverse and remand.

BACKGROUND

In October 2005, defendant was charged with aggravated battery for allegedly beating his father, Charles Schoreck, Sr. (Charles Sr.), with a garden hose. The trial court granted defense counsel's motion for appointment of a psychologist to determine whether defendant was fit to stand trial. The trial court appointed Dr. Robert L. Meyer to evaluate defendant. Dr. Meyer evaluated defendant on October 21, 2005, and released his report on November 11, 2005. Dr. Meyer wrote in relevant part:

"Background Information:

*** [D]efendant denies that he has had any past medical health treatments. He denies that he has had [sic] been on any form of psychotropic medication. He does admit, however, that he has been evaluated by a psychiatrist on many occasions following domestic disagreements. [Defendant] generally was quite guarded and would provide little in the way of detailed clinical history.

Behavioral Observations & Mental Status:

*** Examination of [defendant's] mental status did not suggest any perceptual disturbances nor was there any indication of first rank symptoms in the form [of] thought insertion, thought control, and thought broadcasting. However, in this examiner's opinion[,] [defendant's] thinking was quite delusional ***. *** [A]s the interview proceeded [defendant's] agitation increased as well as [his] delusional statements. [Defendant] spoke about a conspiracy of his neighbors in compliance with the Rockford Police who are essentially harassing him. He spoke about police officers being paid off by the mob and that informants would be murdered or have their eyes removed. He indicates that he has had

difficulties with the police, his neighbors, and the mob since 1978. [Defendant's] emotional

demeanor could only be described as extremely agitated.

While no formal assessment of [defendant's] intellectual abilities [was] conducted,

he

appeared to [be] of [sic] grossly average in his intellectual abilities and there did not appear

to be any significant impairment in his recent or remote memory.

Understanding of the Legal Situation:

[Defendant] can state the charges which led to his arrest and can provide the story

surrounding the circumstances. [Defendant] does have understanding of the players and their

responsibilities in court. For instance, he reported the judge is to decide whether one is guilty

or not. [Defendant], however, rather cynically reported that he would not be surprised if the

judge was also being paid off by the mob. He understood the [S]tate's [A]ttorney was there

to attempt to prove one guilty. He reported witnesses are there only after they have been

harassed by the cops, stating they are supposed to tell the truth, but they would not, because

the police will harass them and possibly kill them. When asked the role of plea-bargaining,

he reported it is to degrade oneself and admit wrongdoing. He understood that he had the

right to refuse or accept the negotiated plea. He appears to understand other rights as well

including his right to remain silent and his right to face his accusers.

[Defendant] understands he has a public defender and attorney representing [him].

[H]e did report the responsibilities of his public defender are to defend him.

Summary & Conclusions:

[Defendant][,] in this examiner's opinion[,] is suffering from a delusional disorder,

NOS. He believes there is an elaborate conspiracy between his neighbors[] [and] police, including judges and public officials[.] Although he has an understanding of the players and their responsibility in the courtroom and general legal processes, because of his delusional thinking, it is this examiner's opinion that [defendant] would be incapable of making a rational decision and maintaining it over time. He would be incapable of communicating meaningfully in general[,] and specifically with his attorney[,] and clearly would be incapable of knowingly, willingly, or knowledgeably entering into plea negotiation. As such, it is this examiner's opinion that [defendant] is adjudicatively incompetent [and] unfit to stand trial. Due to the nature of [defendant's] charge and his agitated state, it is this examiner's opinion that [defendant] is in need of a secured inpatient treatment center, where with use of targeted psychotropic medication and psychoeducation services [he] should be restored to fitness within 90 days."

Based on the report, defense counsel moved for a fitness hearing. The State did not oppose the motion and stated that it did not intend to retain its own expert.

The fitness hearing was held on January 16, 2006. Prior to the hearing, defense counsel noted that defendant himself disputed Dr. Meyer's finding of unfitness but that the defense would nonetheless proceed with the hearing. In lieu of Dr. Meyer's appearance, the parties stipulated that he would testify consistently with his report. The court accepted the stipulation, and the defense presented its sole witness, defendant.

Defendant testified that he lives in Rockford with Charles Sr., who is 80 years old. Defendant acknowledged that he was charged with aggravated battery against Charles Sr. Defendant testified that the police "said [he] struck [his] father with a hose in the backyard." Defendant denied

the allegation. Defendant testified that Charles Sr. had been watering with a hose outside their home when he inadvertently directed the water into the basement and electrocuted defendant. Defendant testified that he took the water hose from Charles Sr. but did not strike him with it.

Defendant testified that he met with Dr. Meyer in October 2005. Defendant claimed that the meeting "lasted five minutes at the most." Dr. Meyer asked defendant only three questions, regarding the respective roles of the judge, the State's Attorney, and the public defender. Dr. Meyer did not ask defendant about the incident that led to his arrest or about his medical history.

Defendant testified that he was not taking any prescription medication. He insisted that he was not "psychiatrically disabled." When asked if he had ever taken prescription medication, defendant testified that he was once sent to Elgin State Mental Hospital over a "domestic argument" and was given medication, including Depakote. He was evaluated in Elgin by Dr. Carrington, a psychiatrist. After his release from Elgin, defendant saw an "Arabic" doctor in Rockford.

Defense counsel then asked defendant about various aspects of the criminal process:

"Q. Do you understand what a trial is in a criminal court?

A. Yes.

Q. Can you explain to us what that means, what you understand a trial would be?

A. Well, you got a trial by judge or you got a trial by jury. A trial by judge, you leave it up to the judge to determine your innocence or your guilt.

Q. And what would happen during a jury trial?

A. Well, you got more people to hear what your testimony is to determine are you

right or are you wrong. It's the same way as a judge, just that you are leaving it up to your peers to decide are you right or are you wrong, where you are being accused of a crime that you did or did not commit.

Q. Do you believe that you have a right to a trial?

A. Well, yes, I do. I am an American citizen. I fought for this country in Vietnam.

\*\*\*

Q. \*\*\* If your case was set for trial, what would be the State's role as far as witnesses are concerned?

A. Well, the State, it's their job to prosecute me and find witnesses to possibly prove that I am guilty. But, like I said to the police when they arrived at the home, the woman across the street was the one that called, Loretta Johnson; she borrowed $20 from me and I explained fully that she was trying to get out of paying me my money. She's--

Q. Again, I have to ask you not to talk about what you are actually charged with, just what would happen at trial. Do you understand that you would have the right to call witnesses if you had any on your own behalf?

A. Yes.

Q. Do you understand that you have the right to testify at trial?

A. Yes.

Q. Can you explain to me what that would mean, having the right to testify at trial?

A. Well, to speak up for my right to, my freedom, but I didn't do nothing wrong.

Q. Do you understand that--are there any other ways to resolve a case, a criminal case, without going to a trial?

A. Well, there is no plaintiff--there is no case in an event like this where it is a family matter; it was an accident. It was not a criminal case. Like I stated, water and electricity do not mix. But it's an accident, that he didn't realize he caused [it] himself because he is on medication. He doesn't realize that he is disoriented, what he is doing. I am not prosecuting my father, because they told me to press charges on him. I didn't listen to what they had to say. Because it was an accident; it was not a criminal case. In my book, I don't call accidents criminal cases. In matters like this, I would just ask the judge for a letter saying case dismissed with a signature so there is no more repercussions here where anybody gets sued.

Q. Have you ever heard of the term plea bargain before?

A. Yes, I heard that before.

Q. Do you understand what the term means?

A. Well, it depends on what you are pleading to. I am pleading not guilty because I didn't do nothing wrong. I just stated an accident is not a criminal case. I was the one that was electrocuted by the water that came through the window that shocked me to the floor.

Q. Again, I have to stop you right there, please. Don't talk about what did or didn't happen on that date.

A. Well, that's what I tried to explain to the officers so they understand my viewpoint, what I did.

Q. Do you understand what the word plea bargain means?

A. Well, it means explain the best you can to the best of your ability what happened,

and that's what I tried to do. I tried to come up with an answer for a problem, not a problem without an answer that leads to a lawsuit or ungodly amounts of time spent behind bars where I could be doing better myself working and paying my bills like I was doing, not making a mountain out of a molehill."

On cross-examination, the State questioned defendant about the incident that led to his arrest. Defendant reiterated that he did not strike Charles Sr. with the water hose. Defendant testified that "the lady across the street" called the police when she heard him and Charles Sr. arguing. Defendant testified that the police "[took] the law into their own hands" when they came to his house to arrest him. According to defendant, the police "had their guns pulled out and they were threatening if I didn't open up the door they would shoot through the door." Defendant told the police they were using unnecessary force and also trespassing contrary to the Bible, which says " 'thou shall not trespass against thy neighbor.' "

Defendant testified that he had frequent difficulties with the police. He claimed that the police "[l]et this one guy frame [him] for strong armed robbery, saying he is going to kill my whole family, and [the police] don't do nothing about him." Defendant claimed that the police were hostile to him because they disliked his cousin, Douglas Hall, a fellow police officer and "head of the traffic division." Asked if he believed the "police are paid off by the mobsters sometimes," defendant replied, "They could be; possibilities exist." Defendant further claimed that "[e]veryone has got problems with the mob" and that "Uncle Sam" is the "biggest mobster of them all" because "[w]e will lose our home if we don't pay our taxes."

Defendant testified that he also had difficulties with his neighbors. He claimed that his neighbors were "always bumming money and food from [him] all the time" and that the woman across the street "bummed $20 *** and wouldn't pay the money back."

Asked what he believed was the role of his attorney, defendant replied, "To defend my rights so I can regain my freedom so I am not incarcerated here any further than I have to be here." Asked if he understood the purpose of the present proceedings, defendant said, "Yes. It's an evaluation to see if I am fit to stand trial." With this, the State concluded its cross-examination.

The defense declined redirect but noted that it was submitting as evidence both Dr. Meyer's report and the pretrial services report. The pretrial services report recorded defendant's responses to questions about his personal and criminal history. The report did not address any matter of import that was not covered at the fitness hearing.

After the State rested, the trial court asked its own questions of defendant. The court inquired about the domestic incident that led to defendant's stay in Elgin. Defendant testified that Charles Sr. was the complaining witness in that case also. Defendant claimed that the police had "pitted" Charles Sr. against him "as usual." Defendant also reiterated his opinion that the police were harassing him because they disliked his cousin.

The court revisited the issue of plea bargaining:

"THE COURT: I am going to talk to you a minute about what a plea bargain is. A plea bargain is where the State would make an offer to your attorney where they would recommend a certain sentence to the Court if you pled guilty. Your attorney would make a counter-offer or counter-demand and there would be negotiations that would go back and forth between--

THE DEFENDANT: (Interrupting)  Well, that's why I told them, Your Honor, I plead not guilty because I didn't do any physical harm or mental harm to my father.  The police are using him against his own wife, his own daughter and me.  That's not their right to do that.

THE COURT:  Stay with me though; okay.  I understand that's your position.  You are saying 'I am not guilty.'  But I want to make sure you understand what a plea bargain is, even if you are not guilty; okay.  Imagine we are talking about someone else's case; okay.

THE DEFENDANT:  Well, I believe if you are guilty you are going to bargain for a lesser sentence than what they are offering.

THE COURT:  Okay.  And the person charged would have the right to accept the State's offer or reject the State's offer; do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And they could persist in their plea of not guilty or they could accept the State's offer and plead guilty; do you understand that?

THE DEFENDANT:  Uh-huh.  (Affirmative response).

THE COURT:  Or they could tell their attorney to go back to the State with a counter-demand; do you understand that?

THE DEFENDANT:  Yes.

THE COURT: That would be a negotiating process.

THE DEFENDANT:  Yes.

THE COURT:  All right.  That's what a plea bargain is.  So do you understand what I am talking about?

THE DEFENDANT: Yes, I know what you mean."

Following this colloquy, the trial court reviewed the evidence and concluded that the State had sustained its burden of proving defendant fit to stand trial:

"Okay. Here is the situation, the defense has raised the issue of the defendant's fitness. There was a bona fide doubt about the defendant's fitness. The court ordered a determination, ordered an evaluation by Dr. Meyer. Dr. Meyer examined the defendant, said that he was delusional and because of his delusional thinking he would be incapable of making rational decisions and maintaining them over time. He would be incapable of communicating meaningfully in a general way, general and specifically with his attorney and would be incapable of knowingly, willingly or knowledgeably entering into plea negotiations. And, therefore, he is adjudicatively incompetent.

Although, I am not convinced of the veracity of everything that [defendant] said. He understands the role of the Court, counsel, jury. He understands the purpose of plea negotiations, although he maintains his innocence and, therefore, refuses to participate in plea negotiations.

Also, clearly Dr. Meyer obtained information about [defendant] either from him-- and that's why I said I am not convinced [defendant] didn't provide some of this information. Some of it also could have been derived from the pretrial services report; if Dr. Meyer had access to that, I don't know. I just cannot find based on what's been presented me today that [defendant] is incompetent or incapable of proceeding.

So unless there is some additional information that somebody wants to present to me, I am going to find that he is fit and able to stand trial."

The court set the matter for trial.

On February 28, 2006, the first day of trial, defense counsel remarked to the court that he had discussed with defendant "the possibility of any alternate pleas based on mental status." Defendant, according to counsel, had refused to make any such plea. When the court asked defendant whether he was familiar with the plea of not guilty by reason of insanity, defendant replied, "Yes, I have heard that, but I says [sic] I am not nuts." The court then began to explain the plea of guilty but mentally ill, and defendant interjected:

"Well, I am not on any medication, so there shouldn't be any reason to say I am mentally ill because I am not on any medications. I wasn't shot in the head with a bullet. My dad was. He does have a mental illness, and he is now mentally ill because he had a bullet in his head. I didn't get one in the head."

The trial court replied, "All right. Fair enough." The court said nothing more on the issue, and the case proceeded to trial.

Prior to opening statements, the State informed the court that, according to the police reports, when the police arrived at defendant's home in response to a report that he had beaten Charles Sr., defendant said, "Blow away. You don't have a warrant, so you ain't coming in." The State stated that, to avoid any potential constitutional infringement, it had instructed the police officers not to testify to defendant's remark about the warrant. The State asked defense counsel whether he intended to reference defendant's statement, and counsel replied that he and defendant had agreed, "in terms of strategy," not to inquire about the statement.

After opening statements, the State presented its witnesses. Loretta Thompson testified that she lives across the street from defendant and Charles Sr. On September 11, 2005, Thompson saw defendant beat Charles Sr. with a garden hose in their yard. Thompson called the police.

Rockford police officer Harold Combs testified that, on September 11, 2005, he responded to a complaint of a domestic battery at the Schoreck home. Upon arriving at the residence, Combs spoke with Charles Sr., who stated he "needed help" with his son. Combs had Charles Sr. remove his shirt, and Combs observed several welts on his back. Rockford police officer Karol Fricke, who also responded to the complaint, confirmed that Charles Sr. had welts on his back.

Charles Sr. testified that, on September 11, 2005, he was watering a tree in his yard when defendant snatched the hose from him and struck him with it several times on the back. Defendant then accused Charles Sr. of electrocuting him by spraying water through a basement window. Charles Sr. testified that the police later came and arrested defendant. Charles Sr. testified that he did not spray water into the basement nor did he observe any extraneous water when he later accompanied one of the police officers into the basement.

The defense presented no witnesses. When defendant announced his intent not to testify, the court made this set of inquiries:

"THE COURT: *** Mr. Schoreck, I think you remember from talking to me before that you have the right to testify in your case. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. Now, your lawyer is here to advise you, to give you advice based on his experience. Do you understand?

THE DEFENDANT: Uh, huh.

THE COURT: Say yes or no, sir.

THE DEFENDANT: Yes.

THE COURT: All right. You have the right to testify. In other words, if you want to, it's your choice. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: No one can keep you from testifying if you want to testify. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: No one can make you testify if you don't want to testify. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: Is it your choice not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Fair enough."

The jury found defendant guilty of aggravated battery.

A sentencing hearing was held on May 2, 2006. Defendant made a statement in allocution, which we quote in full for what it reveals about defendant's general frame of mind as well as his understanding of the process that led to his conviction:

"I just want my viewpoint heard. I wasn't heard in court. I look at this as a mistrial because nobody had me called up to the jury stand [to] hear my side of the story. They are just listening to the prosecutor's side of the story. They are not listening to my side of the story.

-14-

My [d]ad electrocuted me with water in my house. All I did [was] pull the hose out of his hand when he electrocuted me. They don't want to listen to the facts. I was electrocuted in my house I own.

They are putting him up, sign an Order of Protection to run me out of the house, take over the house. All I did [was] take the hose out of his hand. She is mistaken when she said I hit him with the hose. No. I grabbed the hose out of his hand because I was electrocuted. The water hit [a] 120-volt electric box near the window of the house. My side was never hurt [sic], so I consider this to be a mistrial, a travesty of justice on my behalf not being heard. My side should be heard. There's two sides to every story. I was electrocuted by my [f]ather, guilty of trying to kill me in the house. He is--he and his girlfriend take over the house, get my car, my home, wipe it out. He doesn't want the truth to come out. He sexually abused Debbie, my sister. He's taking sides, framed me, strong armed robbery [in] Chicago, a rapist. He is going against me. He wants to kill me, take over the house. The truth isn't coming out until I speak up right now, that he is guilty of taking sides with a man that framed me for strong armed robbery. It's a power struggle, get my home. I paid $599 cash to Mr. Flowers, to the house, paid him in cash. The check was made out at Bank of America, where I have my account of $100,000. I wrote out the check to Mr. Flowers. He can prove it. We can track him down. I bought the home from him. He is trying to take over my identity or something with this guy. He is using two different names. His name is Harold Getz. He used the name Billy Joe Good. He has Debbie. He is using her as a hostage. The truth doesn't want to come out when they are guilty.

Why would he sign an Order of Protection, because he's guilty of electrocuting me

in the house?  I'm the one that's got more to grumble about here than anybody else.  I was almost killed in my house.  I have a right to take the hose out of the hand, shut the water off.  This woman, the girlfriend, owes me $20.  She come[s] up to the house before this happened asking for $20 for gasoline.  Her name was Loretta Johnson, not Thompson.  'I want $20.  I'm your new neighbor.  Can you loan me--'  I said, 'Sure.'  She makes up a story when I go.  I see her van in the driveway of the house.  She says to me, 'I'm not going to give you the money.  You don't need it.'  She says, 'You try to get--ask me for the money back.  I'm going to say you are running a dope house, whore house.[']  She was drinking, smoking marijuana.  I could smell it in the doorway, her girlfriend behind the door.  'Lady if you ever need money, don't come around my house ever again.'

She made up a crime story to get out of paying my $20 back.  That's why she makes up a story, get out of paying me $20.  He is listening to his girlfriend, take over my house.  Why did he give me the same name, different name?  He wants to give me the same name so he can knock me off.  That's what he wants to do.  He don't give a damn about me.  Because if he did, he wouldn't have signed an Order of Protection, his own son, disgraced me, fought in the United States Marine Corps.  How can he call a [M]arine himself, to demean my character.  I'm sitting here, getting harpooned with sticks.  I have a fracture, no medical attention, two broken feet.  I feel like I'm coming down with blood poisoning.  Nobody even let me go out [to] see my Doctor, Dr. Hayes.  They won' t let me make a call out of here.  I'm trapped like a rat where I'm stuck with a decision.  Do I take two years of probation?  I guess I will have to get out of here, get decent legal representation, from an attorney that knows what he is doing.  That's still [sic] to go after him, demeaning my

character, electrocuting me, not owning up to responsibility. It's his fault, not my fault. He electrocuted me. I got all the right to sign charges on him for attempted murder.

There's stuff on here that I didn't do. I am being charged with crimes I didn't even do because they got it in for me. I have worked hard all my life, fought for my country. What am I getting [is] disgraced. I'm being called a killer, murderer, everything else, my buddies in the Marine Corps being demeaned by the Communist party, disgraced, all I got out of this. What was I fighting for, quality for the enemy, get back at me. Yes, it looks that way to me when he doesn't own up to responsibility myself. Yet he can't even take responsibility [for] what he did [to] his own daughter, sexually abusing his own daughter, not caring about her, letting a man [frame me for] strong armed robbery, walk in the house, make a mockery out of my family. He ain't man enough to fight back when he's taking sides with the enemy. Because he's a sick man, needs to be put away." (Emphasis added.)

The presentence report noted that defendant had refused to sit for a presentence interview. The report reflected that defendant had prior convictions of robbery, criminal trespass to land, and criminal damage to property. The report also indicated that, on March 3, 1999, defendant underwent a mental health evaluation at the Janet Wattles Center and was diagnosed with "Bipolar I-hypomanic and Antisocial Personality Disorder."

The trial court sentenced defendant to three years of imprisonment. He filed this timely appeal.

## ANALYSIS

Defendant makes two arguments on appeal. First, he argues that he was not proven fit to stand trial. Second, he asserts that the trial court failed to insure that his waiver of an insanity

-17-

defense was knowing, intelligent, and voluntary. We agree with defendant on the fitness issue and find it dispositive of this appeal.

In his opening brief, defendant anticipates an argument from the State that he waived the issue of fitness by failing to raise it in his posttrial motion. Defendant argues that the issue is reviewable under the plain-error rule, and we agree. "Fitness for trial is a fundamental right, and therefore the plain error doctrine permits review of fitness issues that would otherwise be waived." People v. Meyers, 367 Ill. App. 3d 402, 409 (2006), citing People v. Sandham, 174 Ill. 2d 379, 382 (1996).

The State concedes that application of the plain error rule to save a fitness issue otherwise waived is "normally" appropriate, but not on the particular facts here. The State maintains that we should enforce waiver because defendant's attack on the trial court's fitness determination is based in part on circumstances that arose at trial and sentencing, yet defendant failed to reopen the issue of fitness at any time after the fitness hearing. The State overreaches in arguing for complete waiver of the fitness issue, when we could simply restrict our review of the fitness finding to the circumstances existing when the finding was entered. We decline to impose even this lesser sanction, however, because the trial court was under a continuing duty to revisit on its own initiative the issue of defendant's fitness whenever there arose a genuine doubt of his competence, whether before, during, or after trial. Defendant's reliance on facts that arose after the fitness hearing is entirely proper even though he himself did not raise the issue of fitness subsequent to the hearing. See Sandham, 174 Ill. 2d at 382, 389 ("the circuit court has a duty to order a fitness hearing, sua sponte, any time a bona fide doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense," and "all the events and testimony cited by the

defendant, including those occurring during the sentencing hearing, are relevant to defendant's fitness at the time of trial").

We turn to the merits of the fitness issue. "Due process bars the criminal prosecution or sentencing of a defendant who is not competent to stand trial." People v. Woodard, 367 Ill. App. 3d 304, 319 (2006). A defendant is presumed fit to stand trial (725 ILCS 5/104--10 (West 2004)), but, when a bona fide doubt as to the defendant's fitness is raised, "the court shall order a determination of the issue before proceeding further" (725 ILCS 5/104--11(a) (West 2004)). The court must hold a "hearing to determine the issue of the defendant's fitness." 725 ILCS 5/104--16(a) (West 2004). The fitness determination is governed by the following nonexclusive set of factors:

"(1) The defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

(2) The defendant's ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel;

(3) The defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." 725 ILCS 5/104--16(b) (West 2004).

The overarching criterion of fitness is:

"A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104--10 (West 2004).

Fleshing out this standard, Illinois courts have held that a defendant is fit to stand trial if he "has sufficient present ability to consult with defense counsel <u>with a reasonable degree of rational understanding</u> and *** has both a <u>rational and factual understanding of the proceedings</u>." (Emphasis added.) <u>People v. Baugh</u>, 358 Ill. App. 3d 718, 732 (2005).

There is no dispute that Dr. Meyer's report raised a <u>bona fide</u> doubt as to defendant's fitness, thereby requiring the court to hold a fitness hearing. The question is whether the State proved by a preponderance of the evidence that defendant was fit. See 725 ILCS 5/104--11(c) (West 2006) ("When a bona fide doubt of the defendant's fitness has been raised, the burden of proving that the defendant is fit by a preponderance of the evidence and the burden of going forward with the evidence are on the State"). Both parties assert that a trial court's finding of fitness is reviewed for abuse of discretion. Indeed, there are several appellate decisions that so hold. See, <u>e.g.</u>, <u>Baugh</u>, 358 Ill. App. 3d at 732 ("A trial court's fitness determination will be reversed only upon a showing of an abuse of discretion"); <u>People v. Jones</u>, 349 Ill. App. 3d 255, 261 (2004) (same). However, as our supreme court held in <u>People v. Haynes</u>, 174 Ill. 2d 204, 226 (1996), "[t]he trial court's ruling on the issue of fitness will be reversed only if against the manifest weight of the evidence." This proposition was indirectly reaffirmed by the supreme court in <u>Best v. Best</u>, 223 Ill. 2d 342, 348-49 (2006), which held: "When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence." Accordingly, the standard that guides us is whether the trial court's finding of fitness was against the manifest weight of the evidence.

While we ultimately agree with defendant that the trial court erred on the fitness issue, we note our disagreement with one thread of defendant's reasoning. Defendant asserts that the trial court

"should not have discounted persuasive, uncontradicted expert testimony from Dr. Meyer that [defendant] was unfit due solely to [defendant's] statement that he was fit and that he had a factual understanding of how the legal process operates" (emphasis added). Defendant sets up somewhat of a straw man here. If defendant indeed offered an opinion on the ultimate question of whether he was fit to stand trial, or on the penultimate question of whether he understood the proceedings against him or could participate in his defense, the trial court could not have considered that opinion as evidence of defendant's fitness, for such would be clear question-begging. This is the teaching of People v. McKinstray, 30 Ill. 2d 611 (1964), and People v. Baldwin, 185 Ill. App. 3d 1079 (1989), both cited by defendant.

In McKinstray, a psychiatrist testifying for the defense at a fitness hearing opined that the defendant was unfit. The psychiatrist diagnosed the defendant with organic brain disease, based on his history of mental illness and the psychiatrist's own observations of the defendant's behavior. The defendant was the sole other witness at the fitness hearing. The supreme court described his testimony as follows:

"[Defendant] described a skull fracture which he sustained in a 1959 automobile accident and his subsequent hospitalization. He testified that he understood the nature of the charge against him. Defendant was asked whether in his own mind he was able to co-operate in the defense of this case; he replied, 'Well, I feel like I would be more than willing to try, and I really feel I could, yes sir.' " McKinstray, 30 Ill. 2d at 614.

The State presented no evidence. The fitness question was put to a jury, who found the defendant fit. The supreme court reversed, holding that the trial court should have directed a verdict of unfitness:

"Defendant clearly rebutted the presumption of his sanity and the People offered no evidence, relying on the testimony of the defendant to establish his ability to rationally conduct his defense and co-operate with counsel. To accept defendant's opinion that he is able to co-operate with counsel in his defense, when the purpose of the hearing is to determine that very fact, would make a sham out of the sanity hearing, especially here where there is a history of a severe head injury and psychiatric treatment and the opinion of the sole medical witness that the defendant, although understanding the nature of the crime with which he was charged, was unable to co-operate with his counsel and was then committable to a mental institution."

(Emphasis added.) McKinstray, 30 Ill. 2d at 616-17.

Although the supreme court in McKinstray described the defendant's testimony in rather general terms, it is evident from the holding in the case that the testimony essentially consisted only of the defendant's own "opinion" that he understood the charge and could participate in his defense. The court held that to take a defendant's opinion that he is fit as evidence of his fitness would circumvent the fitness inquiry. Importantly, the McKinstray court said nothing of the relevance of a defendant's testimony apart from his opinion regarding his fitness. Such testimony obviously has potential relevance to one or more of the statutory factors that guide the fitness determination. See 725 ILCS 5/104--16(b) (West 2004).

McKinstray was relied on in Baldwin, where again the only evidence in opposition to a psychiatric conclusion of unfitness was the defendant's testimony, which the appellate court described as follows:

"Defendant stated that he believed he was fit to stand trial.  The trial judge then interrogated the defendant as to his understanding of the nature and purpose of the proceedings. Defendant stated that he understood who the individuals in the court were and what they were there to do.  When the trial judge asked him whether he was cooperating with counsel, the defendant stated 'yes--she's good.'  The defendant stated that he often felt depressed but stated he could nevertheless help his attorney because he considered the case 'open and shut.' When queried about his interview with Dr. Markos, the defendant related that the interview lasted for only a short while and that Dr. Markos had only asked him a couple of questions." Baldwin, 185 Ill. App. 3d at 1085-86.

The court found McKinstray "controlling," citing it for the proposition "that an incompetent defendant can hardly be accepted as a reliable witness to his own competency." Baldwin, 185 Ill. App. 3d at 1086-87.  The court held that the trial court erred in finding the defendant fit:

"Since the expert testimony that defendant was unfit was uncontradicted in the trial court, it is our opinion, the trial court could not reject the expert's conclusion without other testimony or evidence that defendant was fit, other than defendant's own statement." (Emphasis added.)  Baldwin, 185 Ill. App. 3d at 1087.

As with McKinstray, we interpret Baldwin's rather general description of the defendant's testimony in light of the court's holding.  Evidently, when the trial court in Baldwin "interrogated defendant as to his understanding of the nature and purpose of the proceedings" (Baldwin, 185 Ill. App. 3d at 1085), the defendant's only potentially relevant responses were, as in McKinstray, his own opinions on the ultimate question of fitness.  This interpretation jibes with the Baldwin court's remark that the defendant was but a "witness to his own competency" and so the case was indistinguishable from

-23-

McKinstray (Baldwin, 185 Ill. App. 3d at 1086-87). Baldwin, like McKinstray, says nothing about the relevance of a defendant's testimony apart from his own assessment of his fitness.

Here, as in McKinstray and Baldwin, the trial court based its finding of fitness in large part on defendant's testimony, but this case differs fundamentally from those authorities in that defendant never offered his own opinion on fitness. Defendant simply is wrong that the trial court rejected Dr. Meyer's testimony in favor of his own "statement that he was fit and that he had a factual understanding of how the legal process operates." Rather, the trial court found Dr. Meyer's conclusions inconsistent with defendant's mentality as evidenced indirectly, as it were, in his testimony.

The remaining case defendant cites in his favor, People v. Williams, 87 Ill. App. 3d 860 (1980), does have relevance here because it suggests that a trial court's observations of a defendant in a particular case may provide too little a sample by which to reject psychiatric conclusions. In Williams, two psychiatric experts testified that the defendant was unfit. The defendant did not testify at the fitness hearing. The trial court found the defendant fit. The trial court rejected the expert opinions as vague and conjectural and relied on its observations of the defendant. The appellate court reversed even though the trial court's finding of fitness was based on its observations of the defendant, not on the defendant's own opinion as to his fitness:

> "[T]he [expert] testimony at the fitness hearing did indicate that this defendant at the time
> of the hearing was not fit to stand trial; such a conclusion should not be rejected by a trial
> court without other testimony or evidence that defendant was in fact fit. Defendant did not
> testify at the hearing or at trial. The trial judge's personal observation of defendant regarding
> his fitness for trial in this case consisted of brief exchanges of casual conversation; the record

does not disclose any other behavior of defendant which might have indicated that defendant was either fit or unfit.  We find that the trial court's rejection of the expert witnesses' conclusions was not warranted solely on the basis of the court's opinion derived from such brief exposure to the defendant or from the court's 'common sense' interpretation of the witnesses' psychiatric testimony." (Emphasis added.)  Williams, 87 Ill. App. 3d at 864. Unfortunately, though the length and nature of the trial court's observations of the defendant was critical to its decision, the Williams court did not detail that contact at all but simply summed it up as "brief."

Though this vagueness makes Williams difficult to distinguish, later courts have indeed distinguished it based on the quality of the trial court's observations of the defendant in that case. In Baugh, two experts testified at the fitness hearing.  They both found that the defendant understood the nature and purpose of the proceedings against him.  They concluded that the defendant was unfit, however, because his narcolepsy, or tendency to fall asleep spontaneously, rendered him unable to cooperate in his defense.  No other witnesses appeared at the hearing.  The trial court found the defendant fit.  The appellate court summarized the trial court's reasoning as follows:

"The trial court accepted the diagnosis of narcolepsy but ruled that there was no credible [evidence] to conclude that narcolepsy impaired defendant to the extent that he was unable to assist counsel in his defense.  Specifically, the trial court noted that defendant was present for numerous pretrial court proceedings and always appeared awake, alert and able to comprehend what was going on.  The court took judicial notice that defendant sat at the table with his counsel for 40 minutes during the fitness hearing and there was no indication that  defendant ever fell asleep or became confused." Baugh, 358 Ill. App. 3d at 723.

-25-

The defendant appealed the finding of fitness, contending specifically that he was not proven capable of participating in his defense. The appellate court affirmed. The court explained that the defendant's "active participation during the pretrial hearings and his demeanor during the fitness hearing, as observed by the trial judge, provided a sufficient basis for the trial court to reject the unpersuasive expert testimony that defendant's narcolepsy rendered him unable to assist in his defense." Baugh, 358 Ill. App. 3d at 735-36. The court found that the defendant's later participation at trial confirmed the earlier fitness finding. The court noted that the defendant's trial testimony "covered over 70 pages of the report of proceedings and [did] not disclose any signs of confusion, inability to communicate with counsel, inability to respond to questioning, or sudden episodes of falling asleep." Baugh, 358 Ill. App. 3d at 736. The court distinguished Williams because "the trial court's exposure to defendant was neither brief nor limited to casual conversations, and defendant testified at the trial." Baugh, 358 Ill. App. 3d at 734; see also People v. Phillips, 226 Ill. App. 3d 878, 887-88 (1992) ("Quite unlike the facts in the instant case, the defendant in Williams did not testify at the hearing or at trial, and the trial judge's personal observation of the defendant regarding his fitness for trial consisted merely of brief exchanges of casual conservation").

After Baugh, Williams, and Phillips, the probative value of a trial court's observations of a defendant is a matter of degree. We hold that the quantity and quality of the court's observations of defendant here bring this case closer to Baugh and Phillips than to Williams. Thus, we cannot agree with defendant's insinuation that the trial court did not see enough of defendant to test Dr. Meyer's conclusions.

When we consider the substance of what the court saw, however, we believe that it corroborates rather than confutes Dr. Meyer's finding that defendant's "delusional disorder" rendered

him "incapable of making a rational decision and maintaining it over time" and, ultimately, "incapable of communicating meaningfully in general and specifically with his attorney." In his supporting findings, Dr. Meyer recorded that defendant claimed to have had "difficulties with the police, his neighbors, and the mob since 1978." Defendant asserted that his neighbors were conspiring with the police to frame him. He maintained that the police are "paid off by the mob" and coerce witnesses to testify falsely. Defendant suggested that the judge handling his case might also be in the mob's sway. Defendant opined that the purpose of plea bargaining is to "degrade oneself and admit wrongdoing."

Defendant took up the same paranoic themes at the fitness hearing. He claimed that the police generally dislike him because of his cousin and so have refused to take action against a man who framed him for armed robbery and threatened to kill his family. Defendant accused the police of using Charles Sr. against his family. Defendant continued to claim that the police are in the mob's influence. He also asserted that "everybody has got problems with the mob." Defendant intimated that the police were summoned to his house because the woman across the street was trying to avoid paying him the $20 she owed him.

When asked at the fitness hearing to relate his understanding of his various constitutional rights, defendant gave largely sober and accurate descriptions of those rights despite the frequent protestations of innocence he injected into his answers. On the subject of plea bargaining, defendant did not reassert the dark view of the process he expressed to Dr. Meyer but assented to the court's description of the process. Defendant was emphatic that plea bargaining in this case was repugnant to him because he was innocent of the charge.

Passable as defendant's understanding of the legal process seemed, the State left virtually unchallenged Dr. Meyer's negative assessment of defendant's mental capacity and the corroborating evidence of defendant's persecution fantasies. We conclude, therefore, that the trial court's finding that the State bore its burden of proving defendant fit to stand trial was against the manifest weight of the evidence.

Even if defendant had been proved fit at the January 2006 fitness hearing, the trial court was under a continuing obligation to hold a subsequent fitness hearing sua sponte whenever there arose a bona fide doubt of defendant's fitness. See Sandham, 174 Ill. 2d at 382. Indeed, further bona fide doubt of defendant's fitness was raised by his conduct at trial and sentencing. When, just prior to trial, the trial court raised the possibility of a plea of guilty but mentally ill, defendant rejected it on the confused ground that he could not be mentally ill because he was not on medication and "wasn't shot in the head with a bullet." Later, in his statement in allocution at the May 2006 sentencing, defendant ramblingly gave full dress to the conspiracy theory he sketched in the interview with Dr. Meyer and at the fitness hearing. According to defendant, Charles Sr. was attempting to take ownership of the house by bringing false criminal charges against defendant. Charles Sr. had enlisted three people in his plot: (1) his "girlfriend" and neighbor Loretta Thompson, whose unwillingness to pay a $20 debt to defendant was her own motive for wanting him incarcerated; (2) an anonymous man who had framed defendant for "strong armed" robbery; and (3) one Mr. Flowers. Defendant suggested that these people were also intent on stealing his identity. Defendant further accused Charles Sr. of sexually abusing defendant's sister, Debbie. Defendant also claimed that Debbie was being held hostage as part of the schemes against him.

Such was defendant's "viewpoint" of the case--an exceedingly paranoid, freely associational theory that only confirmed Dr. Meyer's opinion that defendant was delusional and had a diminished capacity for rationality. We recognize that "a defendant may be competent to stand trial even though his mind is otherwise unsound." Sandham, 174 Ill. 2d at 388-89. Indeed, despite his handicaps, defendant was able to conduct himself with reasonable decorum in a courtroom setting. Defense counsel even referenced an important strategic decision he made in collaboration with defendant. Nevertheless, we cannot conceive how a person with such an outlandish view of reality could be more help than hindrance to his counsel's attempts to frame a reasoned defense to criminal charges. While we can only speculate why defendant did not testify at trial, we can appreciate why an attorney might accord no place in a defense theory to grandiose claims of conspiracy.

Equally distressing as defendant's far-ranging fantasies are his statements at trial and sentencing that show a basic misunderstanding of core rights. First, prior to trial, defendant voiced the non sequitur that he was not mentally ill in a legal sense because he was not on medication. Second, at sentencing, defendant claimed a "mistrial because nobody had called [him] up to the jury stand [to] hear [his] side of the story." Defendant insisted on voicing his "viewpoint" because he "wasn't heard in court." Defendant complained of a "travesty of justice" in that "[t]hey are just listening to the prosecutor's side of the story." Thus, despite the thorough waiver colloquy at trial, defendant claimed at sentencing that his failure to testify was not his choice. Defendant may have forgotten that he waived his right to testify, or he may have believed all along that the waiver was a sham and that he would not have been permitted to testify even if he wanted. Such a belief would certainly jibe with his delusions of persecution.

We hold that, regardless of whether the State sustained its burden at the January 2006 fitness hearing, defendant's remarks at trial and sentencing raised further bona fide doubt of his fitness. Therefore, the trial court should have adjourned those proceedings and conducted a second fitness hearing. Given the obvious thematic links between defendant's remarks at trial and sentencing and his earlier remarks at the fitness hearing, the trial court should have reexamined whether defendant was indeed fit at the time of trial. At a minimum, the court should have determined whether defendant was fit for sentencing.

We pause to note that our decision here is consistent with People v. Meyers, 367 Ill. App. 3d 402 (2006) (Meyers II), where the defendant had mental deficiencies somewhat akin to what defendant suffered here, yet we affirmed the trial court's finding that no bona fide doubt of the defendant's fitness was raised. The defendant in Meyers II was convicted of striking a police officer with a hammer. On appeal, he argued that the trial court erred by not sua sponte conducting a hearing to determine his fitness. The defendant asserted that a bona fide doubt of his fitness had arisen based on: (1) a finding in a prior unrelated case that the defendant was unfit, which, he claimed, raised a presumption of unfitness in the present proceedings; and (2) the defendant's conduct in the present proceedings.

To assess the defendant's argument, we recounted the prior case, People v. Meyers, 352 Ill. App. 3d 790 (2004) (Meyers I). There also the defendant was charged with battery of a police officer. At a pretrial hearing on February 4, 2002, the defendant laughed maniacally and repeatedly swore at the trial court, which then recessed the hearing for an immediate psychological evaluation of the defendant. Dr. Timothy Brown evaluated the defendant and reported on the record that the defendant was " 'unable to control his behavior' " and was " 'unable to cooperate and assist in the

preparation of his defense as a result of a mental illness.' " Meyers I, 352 Ill. App. 3d at 793-94. The trial court found the defendant unfit, based on Dr. Brown's assessment and the court's own observations. A month later, the defendant's new counsel reported that the defendant was fit. The defendant was tried and convicted on March 25, 2002. During proceedings just after the verdict was returned, the defendant repeatedly swore at the trial court, and the court held him in contempt. Meyers I, 352 Ill. App. 3d at 795-96.

At a posttrial hearing, the trial court sua sponte mentioned the issue of fitness, noting that Dr. Brown had sent the court a letter on February 5, 2002, stating his basis for finding the defendant unfit. We summarized the letter as follows:

"The letter contains a number of Dr. Brown's findings and observations as to defendant's fitness to stand trial, including: (1) that defendant's judgment was grossly impaired; (2) that defendant was irrational; (3) that defendant did not appreciate that the court 'had the ability to take control of him, restrict his freedom, and try him on criminal charges'; (4) that defendant was 'angrily out of control' while in court; (5) that defendant is 'suffering from a psychotic disorder in which his mood fluctuates rapidly'; (6) that defendant is 'suspicious, distrustful, aggressive, and most likely delusional'; (7) that defendant 'lacks the capacity to cooperate with his attorney'; (8) that defendant 'does not appreciate the nature and purpose of the proceeding against him'; and (9) that, to a reasonable degree of psychiatric certainty, defendant is not fit to stand trial." Meyers I, 352 Ill. App. 3d at 796.

After restating the contents of the letter, the trial court implied that the defendant became fit by the time of trial, noting that the defendant had been a " 'gentleman at all times' " during the trial and " 'knew exactly what he was doing.' " Meyers I, 352 Ill. App. 3d at 796. The court also found that the

defendant had assisted in his defense and appreciated the nature of the proceedings. Meyers I, 352 Ill. App. 3d at 796.

The defendant appealed, and we reversed the defendant's conviction. We held that the defendant's conduct just after trial raised a bona fide doubt of his fitness because it was the same type of behavior that he exhibited at the February 2002 pretrial hearing and that led to the finding of unfitness. We found that defense counsel's later claim that the defendant had regained his fitness was not persuasive because counsel admitted that he took the case just the day before. We remanded for a fitness hearing. Meyers I, 352 Ill. App. 3d at 798-800. In Meyers II, we noted that we were unable to discern from the record in Meyers II whether a fitness hearing actually occurred on remand in Meyers I. The parties in Meyers II agreed that no such hearing took place, and we proceeded on that assumption.

In Meyers II, the defendant was openly critical of the proceedings against him, but, in remarkable contrast to Meyers I, he acted civilly during all reported proceedings. At his first appearance, he claimed that the charge was " ' fake' " and that Kane County was " 'mak[ing] up [its] own laws.' " Meyers II, 367 Ill. App. 3d at 406. The issue of the defendant's fitness was not raised at any time before or during trial, which occurred in July 2004. The defendant testified at trial that, on the day in question, he was carrying a hammer while looking for carpentry work near a homeless shelter in Aurora. He testified that the Aurora police approached him and beat him without provocation, having previously summoned an ambulance to the scene with the intent of hospitalizing him. The defendant denied striking any of the officers with the hammer, and he claimed that the Aurora police had threatened his life on prior occasions. The defendant was convicted. At defense counsel's request, the trial court ordered that the defendant undergo a psychological evaluation as

part of the presentence investigation. At sentencing, the trial court noted the presentence report's references to the defendant's beliefs that "his estranged wife's 'people' are involved with the Ku Klux Klan and the Aurora police, that his father-in-law has had the Klan spray paint swastikas at his place of employment, and that each time he files for divorce or for custody of his children, the Aurora police come and beat him up." Meyers II, 367 Ill. App. 3d at 408. The defendant made no statement in allocution. The trial court observed that the defendant suffered from " 'a delusional disorder, persecutory complex' " but found that he was fit at the time of trial and also fit to be sentenced. Meyers II, 367 Ill. App. 3d at 409.

We rejected the defendant's argument on appeal that a bona fide doubt of his fitness arose during the proceedings below. First, we refused to hold that the finding of unfitness in the 2002 proceedings itself raised a bona fide doubt of the defendant's fitness in the 2004 proceedings. We noted the three factors by which courts determine whether a prior finding of unfitness raises a bona fide doubt of fitness in a later proceeding: (1) the remoteness of the prior finding; (2) evidence "that the defendant's unfitness was caused by a continuing or permanent condition"; and (3) the defendant's conduct in the later proceeding. Meyers II, 367 Ill. App. 3d at 411-12. Applying these factors, we said:

"[T]here is no suggestion that Dr. Brown believed [in Meyers I] that this psychotic disorder was permanent in defendant's case or even that disorders of this kind generally are permanent. Defendant's conduct in the proceedings below belies his claim that his disorder was still present. Absent entirely were the profane, irreverent outbursts that marked his demeanor in [Meyers I]. Defendant, in fact, spoke only when asked and was entirely civil. His testimony at trial was coherent and lucid, albeit rather implausible. His colorful

conspiracy theories about the Aurora police, the Ku Klux Klan, and his estranged wife's family may well reflect the paranoid and persecutory beliefs that were detected by Dr. Brown in [Meyers I] and by the trial court in the present case. However, '[f]itness speaks only to a person's ability to function within the context of a trial,' and '[a] defendant can be fit for trial although his or her mind may be otherwise unsound.' [Citation.] Whatever mental afflictions defendant may have suffered at the time of trial, there is no indication that they inhibited his understanding of the proceedings or his ability to assist in his defense at trial." Meyers II, 367 Ill. App. 3d at 412-13.

We then rejected the defendant's alternative argument that his conduct in the proceedings raised a bona fide doubt of his fitness. We necessarily repeated some of our prior analysis:

"[D]efendant behaved in a gentlemanly way during trial and his testimony was coherent and clear, albeit in many respects unbelievable. If defendant retained the unspecified psychotic disorder and negative personality traits identified in Dr. Brown's letter in [Meyers I], they do not appear to have affected his ability to understand the nature of the proceedings and to participate in his own defense." Meyers II, 367 Ill. App. 3d at 414.

Meyers II, we believe, is distinguishable. Dr. Brown's diagnosis in Meyers I was just as dismal as Dr. Meyer's here. In Meyers II, however, the diagnosed condition, which in Meyers I had manifested itself in the defendant's openly antisocial behavior, no longer had a demonstrable effect on his capacity to function in the context of court proceedings--if even the condition still persisted (which we expressly doubted in Meyers II). See People v. Easley, 192 Ill. 2d 307, 320 (2000) ("[f]itness speaks only to a person's ability to function within the context of a trial" and "[a] defendant can be fit for trial although his or her mind may be otherwise unsound"). There was no

indication that the arguable indicia of a persistent pathology, namely a belief in persecution by the Ku Klux Klan and the Aurora police, rendered the defendant unable to participate rationally in the process. See People v. Contorno, 322 Ill. App. 3d 177, 179 (2001) ("The ultimate decision as to a defendant's fitness must be made by the trial court, not the experts"). Here, in marked contrast, defendant showed a profound misunderstanding of certain vital rights of a criminal defendant.

Since there is no practical way for the trial court to now determine whether defendant was fit at trial in February 2006 or sentencing in May 2006, we reverse defendant's conviction and remand for a new trial. Of course, just as the trial court is unable now to determine defendant's fitness at such remote dates, we cannot know whether defendant is now fit for trial. Therefore, a fitness hearing is necessary on remand only if there should arise a bona fide doubt of defendant's current fitness.

In view of this holding, we do not decide the second issue on appeal, which is whether the trial court engaged in an adequate colloquy with defendant when he waived his right to present an insanity defense.

Accordingly, we reverse the judgment of the circuit court of Winnebago County and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

GROMETER and JORGENSEN, JJ., concur.